This morning is our last morning of oral argument for this panel week, and Judge Martin and I have been very pleased to have our colleague, Judge Rattle, from the District of Kansas visit with us this week to assist us with our work, and this is our first occasion to sit with us, and we're very grateful for her willingness to come here and work for free as senior judges do. They make an enormous contribution to the federal judiciary and shoulder about 20 percent of the judiciary's workload. I don't know what we would do without them, and we hope she'll come back. We have three cases to hear this morning. We're familiar with your briefs and the authorities cited in your briefs, and at least portions of the record, and you should feel free in the limited time available to you to get straight to the heart of your argument. We're probably going to have some questions this morning. Pay attention to the traffic lights at the podium. Don't treat the red light as aspirational. When it shines, it's time to wrap it up. If you're answering a question from the court, of course, you can finish your answer, and that'll be on our time. You won't lose any of your rebuttal time if that's something that you have. So we're going to start with United States v. King. Ms. Murray? Good morning. Good morning. I am Attorney LaKanya Murray, and I represent Mr. Antonio King, the appellate in this matter. We moved the court to reverse the judgment entered against Mr. King, and today we're going to have two main arguments. That first argument is that the court erred in denying Mr. King's motion to suppress, and the second argument is that Mr. King was represented, his counsel was ineffective during his representation of him during the suppression hearing. Let's take the second one first. It seems to me that that, that the record's not developed enough for that, and that should be handled in a 2255 motion, right? For this particular, for our position today, Your Honor, I believe that the record is developed for it, for our position today, and the reason I say that as we go back to our first point is that in its brief, the government suggested that Mr. King had the burden of showing that the material facts were intentionally omitted from the affidavit, but that's not true. He only had the burden, we only had to show that those were in the affidavit, and they can be found to be recklessly omitted. Here's the thing, though. To evaluate whether the attorney was ineffective, we need to know who King wanted him to subpoena, whether those individuals in fact possessed information that would have supported his suppression motion, whether the substantiated evidence that he asserts in fact exists, all of that needs to really be developed, doesn't it? I understand that, Your Honor, not for this position. Our position, the reason that Mr. Ham was ineffective in this position, Your Honor, is because he failed to present a main argument to the court. Ms. Martin, over the years, we've just found that really it's better for people like your I don't think Judge Pryor's talking about you especially losing that argument, just preserving it for another day. Okay. Maybe you want to turn to the merits of the motion to suppress. Okay, yes, I will. As it relates to the motion to suppress, Your Honor, our burden is only to show that there were material facts that were omitted from the affidavit. In this case, and we're going to shift from the statements of Mr. Davis and those various statements that I know were presented on trial, and we're going to focus on the material facts. So let's just start with what they were looking for. They were looking for evidence of a homicide. They were looking specifically for vehicle keys, IDs, and clothing that would have victims' bodily fluids on there. And they said that they were looking for that at Mr. King's residence because GPS and cell phone records had him in the vicinity of the crime scene. And that they also had witnesses that said that Mr. King had previously threatened the deceased. And the GPS records also show that not only was he in the vicinity of the crime scene, but he also left there and went home. And if that's all you have, that makes sense, right? However, at the time the affidavit was issued, they also knew that the same GPS records and cell phone records show that Mr. King had never stepped foot in the cemetery where the body was found. That he was only traveling on the road. And if he's only traveling on the road, that means he doesn't have a chance to gain possession of these belongings that they're looking for. At the time the affidavit was issued, they also knew that the deceased was with a third party just prior to his death, and that's Mr. Montrell Davis. And that just after his death, 10 minutes after his death, Mr. Davis is seen on camera in the vehicles, in the deceased vehicle. And if he's driving the vehicle, he has to have the keys. And if he has the keys, then there's no reason to believe that the keys would be at Mr. King's residence. Here's my problem with your argument. It seems to me that if everything had been included in this and Smith's affidavit that was omitted, the affidavit would have still supported a finding of probable cause. In your honor, we disagree with that. If those things would have been included into the affidavit, then the reviewing court would have had a better opportunity to review the total circumstances. Because with this information included in the affidavit, there's no reason to believe that these belongings would be at Mr. King's house. If he was never at the cemetery, never at the church, why would his clothes have the victim's blood on it? If he was never there, how would he have the opportunity to get hold of the belongings? Because after the murder, the video shows that Mr. Davis showed up at Rainbow Foods in the victim's car, and he met a Mr. King. And so, how did Mr. King get his belongings? When the investigator was asked during the suppression hearing, what made you think that Mr. King would have his belongings? He said a phone call. We can't transport clothes and belongings through a phone call. We can't. And so, if that information was included in the affidavit, the judge would have been able to make a common-sense determination based on the total circumstances that it was not likely that the items they were seeking would be at the house. Now, I will tell you the government's position, I believe, was similar to your own, Your Honor. They said on the suppression hearing that even if someone fiddled with the truth a little to make themselves look good, that was not my words. Those aren't your words? That's what they said? Even if they fiddled with the truth. They still had evidence of the threats. But here's the thing. Threats do not get you in the house. The threats alone do not get you in the house. You have to have some reason to believe that the evidence from a homicide is going to be at Mr. King's residence. And he was never at the cemetery, and the GPS and cell phone records showed that. And they knew that when they issued the affidavit. So this is my problem with the way that the affidavit was written. Even though it's technically true, because technically he was in the vicinity of the crime scene at the time the crime was happening, and then he drove straight home, it's misleading. And it's misleading because it fails to tell the court that he was traveling on the road. It made it appear as if there was actually an opportunity for Mr. King to gain possession of these items, when in fact that's the case. And that goes back, and this is why I was saying that Mr. King was not represented by effective counsel during his suppression hearing, because the attorney never presented this argument to the court. And because he never presented this argument to the court, they made their determination based on these statements that Mr. Davis made. And they came to the conclusion that even without Mr. Davis' statements, the search warrant still held up because you have Mr. King in the vicinity of the area, and you have the threats that were made. And if you do combine just the threats that were made and him being in the vicinity of the area and going straight home, then it would stand. But you have to include these other things, because if you include these other facts, then it will make, it will prevent a finding of probable cause. That's what I have. Okay, thank you. Ms. Murray, you've saved five minutes for rebuttal. Ms. Stewart. Good morning. May it please the court, my name is Sandra Stewart, and I'm representing the United States in this appeal. We're keeping you busy this week. Yes, you are. Very busy. I want to turn directly to the arguments that were made in the briefs and that Ms. Murray made this morning about what actually occurred and what was included in this affidavit. Because I think it's important to understand what information Lieutenant Smith had before he wrote this affidavit. And there's no contention that the affidavit on its face did not provide probable cause. I don't think that that's an issue. But it is important to know this background. At the time, we knew that law enforcement knew that Mr. Saquon Wiggins, his body was found on the 19th at about four o'clock. The next day, the family members, in response to this press conference that they have, they come in to talk to Lieutenant Smith, and they tell, there's at least five different people who say Antonio King has threatened to kill Saquon Davis. He did it because Saquon, who was his nephew, had stolen drugs and money from him. Mr. Wiggins had even fled the area. He'd moved to Atlanta. He was then living, he came back to the area, and he was living with Montrell Davis and Yeasha Davis, who was his aunt and uncle. And Mr. Davis is the one, Montrell Davis is the one who ends up giving the information that's provided in the affidavit, a lot of the most important information about Antonio King threatening to kill his family if he didn't help him find Mr. Wiggins. Well, when, in your view, did Mr. Davis first become a suspect? Mr. Davis only became a suspect after he started telling the story about being, he's with Saquon they're driving in the car, some unidentified gentlemen stop them, take them to two different locations. Do you have like a date and time for when all that? Yeah, it's not until the 22nd that he becomes an actual suspect. And that goes back to some of the arguments that I was going to, that's the background. And then Montrell Davis and Yeasha Davis are brought in on the 21st, that's when they make their first statements. Yeasha Davis, from the very beginning, she says that they are afraid. She doesn't say of who, but they say they are afraid. They talk to Montrell Davis and Montrell Davis is the first one to say that they are afraid of strong. And strong is Antonio King. And it's, when the court reviews the records, Antonio King went by a different, had a lot of different names on the street. He was Unk, Big Unk, he was Strong, he was Bonnie, he was Bunny. So he had different names, but it's clear that strong refers to Antonio King and that that was who they were afraid of. So they already know he's afraid. They're so afraid they asked to be put up in a hotel room on the 21st and they are put up in a hotel room on the 21st. Then the next day, Yeasha Davis and Montrell Davis tell Mr. Smith, they end up telling the same story. It doesn't start off that way, but Yeasha Davis tells a story that this is what her husband had told her. They go back to Montrell. He first tells some other story and then he tells them that yes, he has been threatened by Antonio King. He ends up telling three different stories, but the last of which is the one that's included in the affidavit. And the last of which is the one that's basically corroborated by everything else they know. Absolutely, and also that statement, it was not suggested to him first. He really is the one who the family tells them that they're afraid of Antonio King from the beginning. And there were a few more arguments that were made in the brief and I'm not sure that I hit all of them. The only ones we've talked about this morning are ineffective assistance, which I would think you agree with the suggestion that we had made earlier that that's really better addressed in a 2255 motion and then the other is the suppression issue. Right, I do think that the ineffective assistance council issue is going to have to be because Mr. King continually talks about the state from the Russell County Jail that supposedly shows he was booked in earlier so that he could not possibly have been making these or Mr. Davis could not be making these statements. That videotape has never surfaced. And as far as we know, Mr. Hamm never had that. We also know that we have videotape of the entire time that Mr. Davis is giving his statement so that it would be contradictory of the evidence that exists. So I think that that issue is going to have to wait till later. And it's true that Mr. Davis told different stories, but he didn't tell a different story about Mr. King being the one who's threatening him. And I think that's key here because that is the statement that I think. Don't we have to include whatever was omitted and consider it? And if we do, if it still supports a finding of probable cause, then there's just not an error. Right. Yes, Your Honor. Okay. If you have no further questions, I'm not going to waste any more of your time. Thank you very much. And we ask that you affirm the conviction in this case. Thank you. Ms. Murray, you have five minutes. Your Honors, with the inclusion of the facts that we discussed earlier, the fact that Mr. King had never, he was only traveling on the road in front of the cemetery. The fact that he never stepped foot on the church property and he was not actually present at the time of the murder. The fact that we know that Mr. Davis was, in fact, in possession of the deceased vehicle right after he was murdered. The fact that there's no evidence to show that these belongings that they were searching for were in Mr. King's house. Because at the end of the day, when it comes to the search warrant, that's what we're looking for. We're looking to see if there was a possibility for these belongings that were missing from the victim to be at Mr. King's house. And the theory is that Mr. King allegedly hired someone to kill his nephew. And if he went through so much trouble to distance himself from this murder, why would he then turn back around and say, okay, bring me his stuff. I'll hide it in my house. Especially when there's nothing to support that that was the case. Everything points to Mr. Davis. And even if Mr. King was somehow behind this murder, which we're not saying that he was, it still doesn't make it reasonable to believe that the deceased belongings would be at his house. And that's the question today. The deceased belongings being at his house, you're saying supports a theory that it was planted, the evidence was planted there. Well, they never found anything. So they got into Mr. King's house on the theory that, oh, we're going to find evidence of this homicide at Mr. King's house. Well, they never did. And they wouldn't have. What did they find? They found evidence of anything unrelated to the homicide. They found a gun that was not related to the murder. And they found like a bag of cocaine in a separate bedroom for Mr. King under a dresser. Which supported the charges that were then brought. The charges, yes. But if there was no search warrant, then they would never have been in the house. Mr. King was not being surveillance for drug trafficking. There was no, he wasn't being investigated for drugs. He was being investigated for a homicide. And even if he did make those threats, the threats don't get you in the house. What's the status of the capital murder charges in the state? We just discussed that he was just invited in May. Okay. And his You have to look at the totality of the circumstances. And you have to use common sense. And common sense says if he was never at the cemetery, if somebody else is in the vehicle, you're not going to find these belongings that are in the search warrant at his house, no matter how loud he yells. And to another point, too, they say that he kept threatening to kill the deceased. Well, he actually had an opportunity to kill the deceased. The deceased filed a 13 saying that Mr. King had a gun to his head. And so if he wanted to kill him, he could have killed him then. So, and he didn't. So, and then he came out and he was going around everywhere. So he wasn't too afraid of Mr. King. They were just traveling. He was just out in the open. He wasn't trying to hide. He was out in the open and going places because his aunt was like, you need to sit down somewhere. And he just wouldn't. And Your Honor, so we will move that the court reverse the judgment entered against Mr. King and suppress the evidence that was found against him on the grounds that when you include all of the facts, you can't just pick and choose in an effort to, as the government says, make yourself look good. You cannot do that. You have to give the court enough evidence so they can make a common sense determination based on the totality of the circumstances. And you cannot mislead the court into thinking something that was technically true was more than what it was. Thank you. Thank you, Ms. Murray. We note that you were court appointed and we appreciate you accepting the appointment and assisting the court. We're going to hear the next case, McCullough v. City of Montgomery.